**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| LISA HALL, | : |
| Plaintiff, | : |
| | :    CIVIL ACTION NO. |
| v. | :    3-07-cv-0911 (JCH) |
| | : |
| FAMILY CARE HOME VISITING | : |
| NURSE AND HOME CARE AGENCY, | : |
| LLC, | :    MARCH 9, 2010 |
| Defendant. | : |

**RULING RE: MOTION FOR SUMMARY JUDGMENT (Doc. No. 103 & 104)[1]**

Plaintiff, Lisa Hall ("Hall"), has brought this action against her former

employer, defendant Family Care Home Visiting Nurse and Home Care Agency,

LLC[2] ("FCVN").  In her Amended Complaint, Hall alleges sex discrimination in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), the Civil

Rights Act of 1991, 42 U.S.C. § 1981a, and the Connecticut Fair Employment

Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(a)(1).  See Am. Compl. at 8-

9 (Doc. No. 78).  Hall also alleges retaliation in violation of Title VII and Con.

Gen. Stat. § 46a-60(4).  See id. at 9-10.

FCVN has moved for summary judgment on both the discrimination and

retaliation claims.  See Mot. for Summ. J. (Doc. No. 104).  For the reasons

---

[1] Documents No. 103 and No. 104 are duplicates of the same motion.  However,
Document No. 103 appears to have been incorrectly filed on the electronic filing system.  The
court will treat the proper Motion for Summary Judgment as Document No. 104, with the
supporting Statement of Material Facts (Doc. No. 105).  Document No. 103 is terminated.

[2] Hall's Amended Complaint originally included claims against Family Care Plus, LLC
("FCP").  See Am. Compl.  On April 29, 2009, Magistrate Judge Holly B. Fitzsimmons ruled, after
reviewing in camera submissions in connection with a discovery dispute, that there was no
information that would link FCVN to FCP.  See Order (Doc. No. 99).  Hall then filed a Stipulation of
Dismissal as to FCP, and FCP was dismissed from the case.  See Stipulation of Dismissal (Doc.
No. 101); Order re Stipulation of Dismissal (Doc. No. 102).

stated below, FCVN's Motion is granted in part and denied in part.

## I.     STANDARD OF REVIEW

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009).  Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  Id.  In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  See Fed R. Civ. P. 56(c); Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment."  United Transp. Union v. National R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009).  Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'"  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir.2007)); see also Havey v. Homebound Mortgage, Inc., 547 F.3d 158, 163 (2d Cir. 2008) (stating

2

that a non-moving party must point to more than a mere "'scintilla'" of evidence in order to defeat a motion for summary judgment) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986)).

## II.   FACTS

FCVN is a Connecticut corporation that provides home health care services.  <u>See</u> Am. Compl. at ¶ 3. Rita Krett and David Krett, Sr., are the owners and sole members of FCVN.  <u>See</u> L.R. 56(a)(1) Stmt. at ¶ 3 (Doc. No. 105).[3] Their sons, David Krett, Jr.,[4] and Brian Krett were employees at FCVN.  <u>See</u> <u>id.</u> at 4.  The four Kretts would often hold monthly meetings about business at FCVN.  <u>See</u> Deposition of Brian Krett ("B. Krett Depo."), Ex. 7 to Pl.'s Opp., at 36:20-37:25 (Doc. No. 110).

Lisa Hall began working at FCVN on May 3, 2006, as a Community Liason.  <u>See</u> L.R. 56(a)(1) Stmt. at ¶ 15.  As a Community Liason, Hall's job was to build relationships with referral sources, who might then refer patients to FCVN.  <u>See</u> <u>id.</u> at ¶ 12.  Although the issue is hotly disputed, Hall alleges that she was hired to service both upper and lower Fairfield County.  <u>See</u> Deposition of Lisa Hall ("Hall Depo."), Ex. 1 to Pl.'s Opp., at 91:2-12.  FCVN claims that Hall was hired to service a new area encompassing only lower Fairfield County.[5]  <u>See</u>

---

[3] For the purposes of this section, undisputed facts will be cited to FCVN's Local Rule 56(a)(1) Statement.

[4] David Krett (the son) is not David Krett, Jr., but for the purposes of clarity, and consistent with FCVN's Memorandum in Support of the Motion for Summary Judgment, this Ruling will refer to him as "David Krett, Jr." or "David Jr."  to distinguish him from his father.

[5] Hall's own 56(a)(2) statement is unclear on this point.  In certain places, Hall disputes that she was hired to cover Lower Fairfield County.  <u>See</u> L.R. 56(a)(2) Stmt. at ¶ 14, 16. Elsewhere, however, Hall admits that she was hired to cover Lower Fairfield County.  <u>See</u> L.R.

DKS Aff. at ¶ 8-9.  Hall's supervisor at FCVN was Thomas Harvey, the Director

of Sales.  <u>See</u> Am. Compl. at ¶ 13.  On June 2, 2006, Harvey hired a 23-year-old

male, Angelo Durante, who had no healthcare or sales experience, as a

Community Liason for New Haven County.  <u>See</u> FCVN CHRO Answer, Ex. 16 to

Pl.'s Opp., at ¶ 11.

On or about June 1, 2006, the Connecticut Department of Social Services

issued a policy transmittal stating that beginning July 1, 2006, prior authorization

would be required for home health aide services exceeding fourteen hours per

week.  See L.R. 56(a)(1) Stmt. at ¶ 17.  Previous to this policy transmittal, prior

authorization was required for services in excess of 20 hours per week.  <u>See</u> <u>id.</u>

Medicaid revenue made up about 20 percent of FCVN's annual revenue.  <u>See</u>

Affidavit of David Krett, Sr. ("DKS Aff."), Ex. A to L.R. 56(a)(1) Stmt., at ¶ 10; <u>see</u>

<u>also</u> Deposition of Ruth Krett ("R. Krett Depo."), Ex. 9 to Pl.'s Opp., at 33:2-6.

FCVN's Medicaid revenues dropped approximately $400,000 in 2007.  <u>See</u> L.R.

56(a)(1) Stmt. at 17.

FCVN alleges that the Kretts determined that a layoff would be the most

effective way to address the policy's financial implications for FCVN.  <u>See</u> DKS

Aff. at ¶ 11.  David Krett, Jr., asked Maria Pratt, FCVN's Payroll Supervisor, to

print a list of current employees by department, which she did on June 8, 2006

("June 8 list").  <u>See</u> Affidavit of Maria Pratt ("Pratt Aff."), Ex. I to Def.'s Mot. for

Summ. J., at ¶ 3; <u>see</u> <u>also</u> Computer Printout, Ex. 1 to Pratt Aff.

_____

56(a)(2) Stmt. at ¶ 11, 16.

According to FCVN, over the course of the next two weeks, the Kretts and senior staff met three times to determine which employees should be laid off: on or about June 14, on or about June 16, and during the week of June 19-23. At the alleged June 14 meeting, the Kretts met to discuss which employees they should consider laying off. See DKS Aff. at ¶ 12. According to FCVN, the Kretts considered only non-revenue-producing departments when making this evaluation. See DKS Aff. at ¶ 12. Using the June 8 list, the Kretts marked "LO" next to names of employees they were considering laying off, and placed a check mark next to names of employees that were to be retained. See DKS Aff. at ¶ 13; Deposition of David Krett, Sr. ("DKS Depo."), Ex. 10 to Pl.'s Opp., at 42:1-44:11. On the June 8 list, some names have an "LO" placed next to them which has been subsequently scratched out, while others have the word "layoff" written out next to their name. See June 8 list. An "LO" is placed next to Hall's name. See id. Twenty-one names are variously marked for a layoff on the June 8 list. See id.

FCVN claims that David Krett, Jr., transcribed a list of employees to be laid off based on the discussions during the meeting (the "June 14 list"). See DKS Aff. at ¶ 13; Deposition of David Krett, Jr. ("DKJ Depo"), Ex. 4 to Pl.'s Opp., at 58:4-11; June 14 list, Ex. 2 to DKS Aff. Sixteen names are on the June 14 list, including Hall's. See June 14 list. All but one of those names has an "LO" or "layoff" written next to it on the June 8 list. See June 8 list.

At the alleged June 16 meeting, the Kretts met with senior staff to discuss the June 8 list and to gather their input regarding the employees selected for

5

termination.  See DKS Aff. at ¶ 14; Deposition of Florence Mut ("Mut Depo."), Ex.

6 to Pl.'s Opp. at 38:23-39:2, 39:17-24, 49:10-16; Deposition of Thomas Harvey

("Harvey Depo."), Ex. 5 to Pl.'s Opp. at 75:1-13, 79:16-24; Deposition of Deborah

Berry ("Berry Depo."), Ex. 8 to Pl.'s Opp. at 29:17-25.  Those present at the

meeting included all four Kretts, Harvey, Florence Mut, the Regional Director of

Nursing, and Deborah Barry, the Home Health Aide Program Supervisor.  See

id.

At this meeting, Mut recalled seeing the June 8 list being handed out, and

she made her own notes in the margins[6] as the Kretts and the senior staff

discussed which employees should be laid off.  See Mut Depo.at 39:17-40:8,

44:21-50:7.  Harvey and Mut recalled that Hall's name was already marked with

an "LO" next to her name.  See Harvey Depo. at 80:13-17; Mut Depo. at 46:2-10.

At this meeting, Harvey did not object to Hall's termination.  See Harvey Depo. at

81:24-82:3.  After discussion, the senior staff was asked to consider the list of

employees to be terminated.  See Mut Depo. at 50:1-7.

FCVN claims that a third meeting was held roughly a week later, in the

week of June 19-23, to finalize the list.  See Mut Depo. at 54:12-16, 55:23-56:4;

Harvey Depo. at 84:19-85:18; Berry Depo. at 41:8-42:10; 44:14-22; R. Krett

Depo. at 23:19-25:5.  At this meeting, Hall's name remained on the list of

employees to be terminated.  See DKS Aff. at ¶ 16; see also Berry Depo. at

---

[6] The copy of the June 8 list provided to the court includes Mut's notes, as Mut
was the only person at the meeting to keep a copy in her personal files.  See Mut Depo.
at 40:2-8; DKS Depo. at 54:10-18.

42:6-10; 44:23-45:9; Harvey Depo. 86:21-87:16.  Layoffs were scheduled to take

place on June 29.  See DKS Aff. at ¶ 17, Mut Depo. at 62:20-63:12.

According to FCVN, on the morning of June 29, David Krett, Jr., gave

Maria Pratt a finalized list (the "June 29 list") of employees to be laid off.  See

Pratt Aff. at ¶ 6; June 29 list, Ex. 3 to Pratt Aff.  The June 29 list is handwritten, in

the same handwriting as the June 14 list, and is signed and dated June 29 by

David Krett, Jr.  See June 29 list.  It is titled "Final List."  See id.  There are

eighteen names on the list, including two names that are crossed out.  See id.  In

a different handwriting, on the right side of the page next to each name that is

not crossed out, is a number and "due," as well as "PTO."  See id.  There are no

"PTO" or "due" markings next to the names that are crossed out.  See id.  The

names that are not crossed out on the June 29 list are the same names as those

on the June 14 list.  See June 14 list; June 29 list.  The crossed-out names all

have some reference to a layoff next to their name on the June 8 list.  See June

8 list; June 29 list.  Upon receiving the June 29 list, Pratt computed the final pay

and personal time off (PTO) due to each individual, which she wrote next to each

employee's name.  See Pratt Aff. at ¶ 6.  Pratt asked David Krett, Jr., to sign and

date the list, which was her normal practice.  See id. at ¶¶ 7-8; DKS Depo. at

55:14-20.

Hall disputes FCVN's timeline with regards to the decision.  See L.R.

56(a)(2) Stmt. at ¶¶ 19-26.  In doing so, Hall highlights discrepancies in the

testimony of the Kretts and FCVN's senior staff.  First, Hall notes that, although

FCVN claimed to only consider non-revenue-producing employees for

7

termination, there is an issue of fact as to whether the community liason position is revenue-producing.  For example, Brian Krett testified that the community liason position is a sales position, and that its purpose was to create referrals and thus revenue.  See B. Krett Depo. at 73:18-20, 75:14-76:3.  Further, Harvey testified that he considered the community liason position to be revenue-producing.  See Harvey Depo. at 5:15-22.

Additionally, Hall notes that, based on the meeting attendees' testimony, there is an issue of fact as to the number of meetings and the exact dates they were held.  For example, Brian Krett testified that the final meeting was held on June 16 and there were no further meetings.  See B. Krett Depo. at 126:24-127:13.  David Jr. also recalls only two meetings, and testified that the meeting with the supervisors to finalize the list was held on June 29.  See DKJ Depo. at 55:1-19, 62:22-64:15.  Both Harvey and Mut were uncertain of the dates of the meetings they attended.  See Harvey Depo. at 75:1-8, 84:19-85:18; Mut Depo. at 53:5-54:16.

Although FCVN places a great deal of weight on the various lists it claims were created at these meetings, Hall cites to testimony of FCVN senior staff that is inconsistent with regard to those lists.  For example, Rita Krett was uncertain as to when the "LO" marks were added to the June 8 list, and she could not recall if the "June 14 list" was the one created by David Jr. at the June 14 meeting.  See R. Krett Depo. at 56:4-6, 69:21-70:15.  Brian Krett initially could not recall if he had seen the June 14 list at the June 14 meeting.  See B. Krett Depo. at 104:11-20.  Although the June 14 list is handwritten, both Berry and Mut

8

recall only a typewritten list (the June 8 list) being passed out at the first meeting they attended.  See Berry Depo. at 30:17-31:9; Mut Depo. at 40:2-8, 44:17-23. Berry does not recall seeing a handwritten list; Mut did not recall seeing the June 14 list.  See Berry Depo. at 30:22-31:9; Mut Depo. at 55:3-22.  Harvey, however, thought the list he saw was handwritten (although it may have been typewritten). See Harvey Depo. at 79:3-7.

Finally, Hall highlights some inconsistencies in the testimony as to when the list of employees to be laid off was finalized.  David Krett Jr. testified that the meeting in which the list was finalized was held on June 29.  See DKJ Depo. at 63:1-65:12.  Hall also notes that changes were made to the alleged final, June 29 list.  Donna Simmons, a human resources specialist at FCVN, testified that although Tom Applewhite was listed on the June 29 list, he was instead offered the chance to take a per diem status, but that he then chose to resign.  See Deposition of Donna Simmons ("Simmons Depo."), Ex. 3 to Pl.'s Opp., at 78:10-79:9.  It is unclear from Simmons' testimony at what time this took place.

Hall first heard of the new policy transmittal on June 26, 2006.  See Stmt. of Disputed Facts, at ¶ 13.  She alleges that she asked Harvey about reduction in hours that same day, and that he replied that "it would not affect our potential to get new referrals in."  See Hall Depo. at 267:10-14.  Hall told Harvey that she was pregnant on June 26.  See L.R. 56(a)(1) Stmt. at 27.  Hall alleges that when she told Harvey about her pregnancy, he said "Now I have two girls going on maternity leave.  I can't hire the girls anymore that are young . . ., and I can't hire

them old.  I may as well just keep hiring boys."[7]  See Hall Depo. at 173:2-6.

The next day, Harvey spoke with David Krett, Sr., and Brian Krett to inform them that Hall was pregnant.  See DKS Depo. at 22:11-16; B. Krett Depo. at 132:16-20.  FCVN claims that David Krett, Sr., stated that this would not change their decision, because the termination list was finalized.  See DKS Depo. at 22:11-23:9.  However, David Krett, Sr. also stated that the first time he had heard of Hall was on the 27th, which Hall notes is inconsistent with testimony that she was discussed at the meetings held on June 14, 16, and during the week of June 19.  See DKS Depo. at 22:3-7; Hall Stmt. of Disputed Facts at ¶ 43.

Harvey and Berry held a meeting with Hall on June 29 to terminate her.  See L.R. 56(a)(1) Stmt. at ¶¶ 31-32.  Hall was the only Community Liason terminated.  See Simmons Depo. at 82:22-24.  Another pregnant woman in Hall's office was laid off at the same time.  See Hall Depo. at 196:6-9; Harvey Depo. at 15:9-20. Hall alleges that during her termination meeting, Harvey mentioned the possibility of staying on at FCVN at a reduced salary, but that he had determined that she would not be interested in such an option.[8]  See Hall Depo. at 182:19-183:21.  Hall stated that she would be interested and asked

---

[7] Harvey has testified that he did not make this comment.  See Harvey Depo. at 90-22-91:5.  However, the court emphasizes that, on a motion for summary judgment, it is required to resolve disputed facts in favor of the nonmoving party when there is evidence in the record to support the allegation.  Hall has stated that Harvey made this comment to her upon learning of her pregnancy.  Resolving such questions of credibility is a task for the factfinder (i.e., the jury), not the court.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (U.S. 1986).

[8] Harvey testified that Hall brought up the possibility of staying on at a lower salary, and that he said he would look into it for her.  See Harvey Depo. at 102:12-103:10.

Harvey to see if that would be a possibility.  See Hall Depo. at 183:9-21.  Several days after her termination, after the Fourth of July holiday, Hall called Harvey on his cell phone and his office phone and left him messages to follow up; Harvey did not return her calls.  See L.R. 56(a)(1) Stmt. at ¶ 34; Hall Depo. at 183:22-184:13; Harvey Depo. at 104:11-21.

It was FCVN's policy to try to fill new positions from resumes the company already had on file.  See L.R. 56(a)(2) Stmt. at ¶ 34; B. Krett Depo. at 86:20-23.  In December 2006, FCVN placed an ad in the Connecticut Post for a Community Liason to service Fairfield/New Haven County.  See Help-wanted Ads, Ex. 18 to Pl.'s Opp.; Harvey Depo. at 61:22-24.  In January and February 2007, FCVN ran ads hiring for a Community Liason position to cover Lower Fairfield County.  See Help-wanted ad.

Hall filed a Complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") on September 13, 2006.  See L.R. 56(a)(1) Stmt. at 39.  Hall received a Right to Sue letter from the EEOC on April 19, 2007.  See id. at 42.  She brought this action on June 6, 2007.  See Compl. (Doc. No. 1).  In October 2008, FCVN sent Hall a reinstatement offer for the position of Community Liason for Lower Fairfield County, which Hall rejected.  See L.R. 56(a)(1) Stmt. at ¶ 47-49.

## III.    DISCUSSION

### A.    Sex Discrimination

Count One of Hall's Amended Complaint alleges discrimination in violation of Title VII.  See Am. Compl. at ¶ 31-37.  Count Two of the Amended Complaint

alleges discrimination in violation of CFEPA.  See Am. Compl. at ¶ 38-46.  Title

VII and CFEPA discrimination claims are both analyzed under the burden-

shifting analysis first announced in McDonnell Douglas Corp. v. Green, 411 U.S.

792 (1973).  See Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir.

2004); Curry v. Allan S. Goodman, Inc., 286 Conn. 390, 407 (Conn. 2008)

(Connecticut antidiscrimination statutes should be interpreted "in accordance

with federal antidiscrimination laws.").  This means that Hall must first establish a

prima facie case of sex discrimination.  See Kerzer v. Kingly Mfg., 156 F.3d 396,

401 (2d Cir. 1998).

Hall alleges that she was terminated by FCVN at least in part because of

her pregnancy.  Title VII defines discrimination on the basis of one's sex to

include pregnancy discrimination.  42 U.S.C. § 2000e(k).  To establish a prima

facie case of discrimination, Hall must demonstrate: (1) that she is part of a

protected class; (2) that she was qualified for her position; (3) that she suffered

an adverse employment action; and (4) that the circumstances surrounding the

adverse employment action give rise to an inference of discrimination.  See

Kerzer, 156 F.3d at 401.  At the summary judgment stage, the burden to

establish a prima facie case is de minimis.  See id.

Additionally, in cases where the employer claims that the decision to

terminate was made prior to learning of the plaintiff's protected status (here,

Hall's pregnancy), the plaintiff must "adduce some evidence, whether direct or

indirect, indicating a defendant's knowledge" of the plaintiff's membership in the

protected class.  See Woodman v. WWOR-TV, Inc., 411 F.3d 69, 83 (2d Cir.

12

2005).  "[D]iscriminatory intent cannot be inferred, even at the prima facie stage, from circumstances unknown to the defendant."  See id. at 82.  Thus, because it is undisputed that FCVN did not learn of Hall's pregnancy until June 26, see L.R. 56(a)(2) Stmt. at ¶ 27, in order to prove a prima facie case, Hall must provide some evidence that the decision to lay her off was made after she informed Harvey of her pregnancy on June 26.

Once the plaintiff has made out a sufficient prima facie case, the burden shifts to the employer to articulate a "legitimate, clear, specific, and non-discriminatory reason" for terminating the plaintiff.  See Kerzer, 156 F.3d at 401 (internal quotations omitted).  If the employer satisfies this burden, the presumption of discrimination raised by the prima facie case is rebutted.  See id. The burden then shifts back to the plaintiff.  On a motion for summary judgment, the plaintiff must "establish a genuine issue of material fact either through direct, statistical, or circumstantial evidence as to whether the employer's reason for discharging her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision."  See Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1225 (2d Cir. 1994).

1.    Prima Facie Case

Hall is a member of a protected class, and it is undisputed that she was qualified for her position and that she suffered an adverse employment action. There is evidence in the record from which a reasonable jury could conclude that Hall's termination occurred under circumstances giving rise to an inference of

13

discrimination.  Hall was fired just three days after she revealed her pregnancy, and another pregnant woman was terminated at the same time.  Hall was the only Community Liason terminated, despite the fact that a young male, Angelo Durante, had just recently been hired as a Community Liason.

Finally, Harvey's alleged "hiring only boys" comment provides a strong inference of discrimination.  Courts have generally held "that stray remarks," without more, "even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination."  See Danzer v. Norden Sys., 151 F.3d 50, 56 (2d Cir. 1998) (citing Woroski v. Nashua Corp., 31 F.3d 105, 109-10 (2d Cir. 1994)).  However, even if one stray remark is by itself insufficient proof, it may "'bear a more ominous significance' when considered within the totality of all the evidence."  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 136 (2d Cir. 2000) (citations omitted).

As a court in this district has elaborated, to determine if comments are evidence of unlawful discrimination or merely stray remarks, the following factors are considered: "(1) who made the remark, i.e., a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, i.e., whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, i.e., whether it was related to the decisionmaking process."  See Young v. Pitney Bowes, Inc., 2006 U.S. Dist. LEXIS 20788, at *59-*60 (D. Conn. 2006)(Dorsey, J.)(citations omitted).  Harvey was Hall's supervisor, and he took part in the decisionmaking process about which

14

employees were to be laid off.  A reasonable juror could certainly find the alleged remark to be discriminatory, as it practically lays out a plan for sex discrimination against females of a child-bearing age.  As this court will discuss further below, it is unclear at what stage of the decisionmaking process FCVN was when Harvey allegedly made this remark, but a reasonable jury could find that the decision had not been finalized at the time of his comment.  See infra at 15-17. Therefore, Harvey's alleged comment is more than a mere stray remark.  Taken together with the other evidence Hall produced, a reasonable jury could find that her termination took place under circumstances that gave rise to an inference of discrimination.

FCVN argues that Hall has not set forth a prima facie case of pregnancy because she cannot prove that the decision to lay her off was made after June 26, when she informed FCVN of her pregnancy.  This is a very close question. FCVN notes that all four Kretts testified that Hall's name was placed on the list of employees to be terminated at the first meeting they held in mid-June, approximately two weeks before they learned that Hall was pregnant.  See B. Krett Depo. at 118:24-120:1; R. Krett Depo. at 82:8-84-9; DKS Depo. at 27:11-28:25, 42:23-43:1; 44:4-6; DKJ Depo. at 57:5-7, 95:14-19.  Additionally, Hall's name is marked with an "LO" on the June 8 list, which both Harvey and Mut recall seeing at the June 16 meeting.  See Harvey Depo. at 80:13-17; Mut Depo. at 46:2-10.  The June 8 list appears to be the master list from which any other lists were created, as it has markings on it consistent with a discussion that was not finalized: some names are crossed out, others have "LO" written next to

15

them, only to have that crossed out, while some names have question marks written next to them.  See June 8 list.   Hall's name is on all three lists, and there is no evidence in the record that taking her name off the list was discussed at any of the meetings.  There is clearly support in the record for FCVN's argument that the decision to terminate Hall was made in the two weeks prior to June 26.

However, the burden on the plaintiff to establish a prima facie case is de minimis.  See Kerzer, 156 F.3d at 401.  All Hall must do is produce "*some* evidence, whether direct or indirect, indicating a defendant's knowledge" of her pregnancy.  See Woodman, 411 F.3d at 83 (emphasis added).  Hall has highlighted testimony from David Krett Jr. that the meeting to finalize the list was held on June 29, after FCVN became aware of Hall's pregnancy.  See DKJ Depo. at 63:1-65:12.  While this testimony may have been the product of poor memory , resolving such an issue of credibility is a task for the factfinder (i.e., the jury), not the court.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (U.S. 1986).  Additionally, Simmons stated that there were changes made even to the supposedly "final" June 29 list.  See Simmons Depo. at 78:10-79:9.  The June 29 list has two names on it that are crossed out, neither of which appear on the June 14 list.  See June 14 list; June 29 list.  This could suggest to a jury that the list remained in flux until June 29.  See June 14 list.  Taking Simmons' and David Krett Jr.'s testimony, along with the discrepancies between the lists, a reasonable jury could find that FCVN was still making decisions about which employees to lay off until June 29.  Therefore, Hall has met the de minimis burden of demonstrating sufficient evidence that FCVN was aware of her

16

pregnancy when the decision was made.  She has made out a sufficient prima facie case to meet her burden.

### 2.   FCVN's Legitimate Nondiscriminatory Reason

The burden now shifts to FCVN to articulate a legitimate, nondiscriminatory reason for terminating Hall.  At this stage, the court should take the defendant's evidence as true.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993).  FCVN argues that it had economic reasons for laying off Hall, i.e., the change in the state's regulations which reduced FCVN's Medicaid revenue.  See Def.'s Mem. at 17-19.  To support this claim, FCVN provided the court with the testimony of the Kretts that, upon learning of the change in the regulation, they met to discuss the possibility of laying off employees.  See, e.g., DKS Aff. at ¶ 11.  The Kretts focused on non-revenue employees because they were concerned about a reduction in their Medicaid revenue.  See, e.g., DKS Aff. at ¶ 12.  The Kretts decided to lay off Hall because, according to FCVN, the area she covered was relatively new territory for FCVN.  See id.  Taken as true, this evidence would permit a jury to conclude that FCVN had a nondiscriminatory reason for terminating Hall, thus shifting the burden back to Hall.

### 3.   Pretext

Hall must raise a genuine issue of material fact as to whether FCVN's stated legitimate reason is a mere pretext for discrimination.  She must also raise an issue of fact as to whether it is more likely than not that FCVN fired her because of her pregnancy.  See Kerzer, 156 F.3d at 402.  Hall may rely on the same evidence that she used to demonstrate her prima facie case to show

17

pretext.  See id.  A plaintiff may demonstrate pretext by demonstrating

discrepancies in the employer's story.  See, e.g., Norville v. Staten Island Univ.

Hosp., 196 F.3d 89, 97-98 (2d Cir. 1999); EEOC v. Ethan Allen, Inc., 44 F.3d

116, 120 (2d Cir. 1994).

Hall relies upon the discrepancies she used to prove her prima facie case,

especially those found in David Krett, Jr.'s testimony, as evidence of pretext.

See Pl.'s Opp. at 15-22.  The greatest discrepancies are seen in FCVN's version

of its timeline: FCVN claims that the list was set in stone the week before it

learned of Hall's testimony, but the testimony of David Krett, Jr. and Simmons, in

particular, provide evidence of uncertainty regarding that timeline.  See supra at

15-17.  That uncertainty, standing alone, might not have been enough to raise an

issue of fact as to pretext.  However, there is also a dispute about whether Hall's

position was revenue-producing.  Although FCVN claims it only considered non-

revenue-producing employees for termination, several senior staff members

testified that a Community Liason could be seen as a revenue producer.  See

supra at 5, 8.  Given that discrepancy, along with the fact that Hall was the only

Community Liason who was laid off, a jury could find FCVN's stated reason to be

pretextual.

Finally, discrepancies between the three lists could give rise to an

inference of pretext.  There are twenty-one names with "LO" or "layoff" written

next to them on the June 8 list, sixteen names on the June 14 list, and eighteen

on the June 29 list (with two names crossed out).  See June 8 list; June 14 list;

June 29 list.  The June 14 list includes all of the individuals but one who were

18

eventually terminated.  <u>See</u> June 14 list.  A jury could find evidence of pretext in the fact that this earlier list appears to be more "final" than the one that is titled "Final List" – which, notably, is dated June 29, after FCVN knew of Hall's pregnancy.  Although this is a close case, a reasonable jury could find Hall's evidence to be enough to suggest pretext.

It is not enough for Hall to show pretext; she must also demonstrate that it is more likely than not that pregnancy discrimination was the reason she was fired.  As stated above in the discussion of the prima facie case, there is enough circumstantial evidence, including the above pretext evidence and particularly Harvey's alleged remark, for a reasonable jury to find that pregnancy discrimination was the real reason for Hall's termination.  <u>See</u>, <u>supra</u>, at 14.

While the evidence presented by FCVN might well demonstrate that Hall was laid off for economic reasons rather than due to her pregnancy, this is a question that should be left for the jury to resolve.  Because a reasonable jury could find that FCVN's stated reason is a pretext and that Hall was actually fired because of her pregnancy, FCVN's Motion for Summary Judgment is denied with regard to Counts One and Two of the Amended Complaint.

    B.    <u>Retaliation</u>

Counts Three and Four of Hall's Amended Complaint allege retaliation in violation of Title VII and the CFEPA.  <u>See</u> Am. Compl. at ¶ 47-52.  Hall alleges that FCVN retaliated against her by refusing to rehire her after she complained

about her treatment in the face of her pregnancy at her termination meeting[9] and later filed a complaint with the CHRO.  See Pl.'s Opp. at 32-33.  To establish a prima facie case of retaliation under Title VII or the CFEPA, a plaintiff must adduce sufficient evidence to permit a rational trier of fact to find that (1) she participated in protected activity; (2) the employer was aware of that activity; (3) the employer took a materially adverse action against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse action – that is, that a retaliatory motive played a role in the adverse action.  See Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 205-206 (2d Cir. 2006); Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005).  On a summary judgment motion, the plaintiff's burden at this stage is de minimis. See Jute, 420 F.3d at 173.  If the plaintiff meets the initial burden of these four elements, the burden shifts to the employer to articulate a legitimate reason for its actions.  See Jute, 420 F.3d at 173.  If the employer articulates a legitimate reason, then the burden shifts back to the plaintiff to prove that the adverse employment action was motivated by retaliation.  See id.  On a summary judgment motion, a plaintiff must raise a genuine issue of material fact as to the employer's motivation.  See, e.g., Gallo, 22 F.3d at 1225.

It is undisputed that filing a complaint with the CHRO is a protected

---

[9] FCVN claims that Hall raises these allegations for the first time in her Opposition, and thus, they should be barred.  See Def.'s Reply at 17-18 n.8 (Doc. No. 118).  However, in Hall's Amended Complaint, she did make such allegations.  See Am. Comp. at ¶ 22 ("During the meeting, Ms. Hall told Mr. Harvey that she was extremely disappointed, especially in light of her pregnancy. . . . Ms. Hall informed Mr. Harvey that she was willing to take a 20% pay cut especially in light of her condition and the benefits she was receiving.").

activity,[10] and that FCVN was aware of that activity.  The Second Circuit has held

that refusing to rehire an individual following an employment discrimination

charge is an adverse employment action.  See Weissman v. Dawn Joy Fashions,

Inc., 214 F.3d 224, 234 (2d Cir. 2000).  However, after her termination, Hall

never applied for a job with FCVN.  See L.R. 56(a)(1) Stmt. at 35.  Although she

followed up with Harvey in the week following her termination to determine

whether she could retain her old job at a lower salary, she never applied for a

new job with FCVN.  Hall claims in her Opposition that Harvey "promised" to

reach out to her when new positions opened up.  See Pl.'s Opp. at 32.  However,

this is contrary to Hall's own testimony in her deposition: according to her,

Harvey only stated that he would check to see if she could keep her job at a

lower salary.  See Hall Depo. at 182:15-183:25.

        If a plaintiff has never applied for another job, the employer cannot refuse

to rehire her, and thus there can be no adverse employment action.  See, e.g.,

Johnson v. N.Y. Presbyterian Hosp., 2001 U.S. Dist. LEXIS 10369, at *17

(S.D.N.Y. July 19, 2001); Robertson v. Consol. Edison Co. of N.Y., 1997 WL

65905, at *7 (S.D.N.Y. Feb.13, 1997).  A plaintiff must actually apply for a

position; "merely asserting that on several occasions she . . . generally

requested" to be promoted or rehired is not enough.  See Brown v. Coach

Stores, Inc., 163 F.3d 706, 710 (2d Cir. 1998).  In order to be excused from the

requirement of a specific application, a plaintiff must "demonstrate that (1) the

---

[10] It is less clear that Hall's statement of disappointment at her termination meeting are
protected.  However, for the purposes of this summary judgment motion, the court will assume
that such complaints are a protected activity.

vacancy at issue was not posted, *and* (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer."  See Petrosino v. Bell Atlantic, 385 F.3d 210, 227 (2d Cir. 2004)(emphasis added).  Although it was FCVN's policy to fill new positions from resumes the company had on file, it is undisputed that FCVN posted ads for Community Liason positions, and Hall did not apply.  See L.R. 56(a)(1) Stmt. at ¶ 35, 41.  Therefore, although one could interpret Hall's comments to Harvey upon her termination and FCVN's policy as an "informal procedure" for application, Hall does not meet the first prong of the Petrosino test: that the vacancy was not posted.  Thus, because Hall has failed to make out a prima facie case of retaliation, the court grants summary judgment to FCVN on Counts Three and Four.

## V.    CONCLUSION

For the reasons stated herein, defendant's Motion for Summary Judgment (Doc. No. 104) is **GRANTED** as to the claims of retaliation (Counts Three and Four) and **DENIED** as to the claims of pregnancy discrimination (Counts One and Two).  Document No. 103 is terminated as moot.

**SO ORDERED**.

Dated this 9th day of March, 2010, at Bridgeport, Connecticut.


 /s/ Janet C. Hall
Janet C.  Hall
United States District Judge

22